JDN

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Luis Gutierrez-Valencia, | No. CV-24-00038-PHX-JAT (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff, who is currently confined in the Arizona State Prison Complex (ASPC)-Tucson, Cimarron Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against former Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) Director David Shinn; current ADCRR Director Ryan Thornell; ADCRR Appeals Officer/Director Julie Bowers; Assistant Director for Prison Operations Sean Malone; former contracted healthcare provider Centurion; current contracted healthcare provider NaphCare; and Nurse Practitioner (NP) Siji Thomas.  (Doc. 1.)  Before the Court are a Motion for Summary Judgment filed by Shinn, Thornell, Bowers, and Malone (State Defendants) (Doc. 58) and a Motion for Summary Judgment filed by Centurion, NaphCare, and Thomas (Medical Defendants) (Doc. 89).  The Court will grant in part and deny in part State Defendants' Motion and deny Medical Defendants' Motion.

## I.     Background

In his Complaint, Plaintiff alleged that he was denied adequate and timely medical care for severe stomach pain and a hernia condition, that his denial of care was pursuant to

a custom or practice to deny or delay specialist care and surgery, and that drinking water at the prison was toxic and contaminated, which contributed to his stomach issues. (Doc. 1.)

On screening, the Court determined Plaintiff sufficiently stated the following claims: (1) an Eighth Amendment medical care claim against Defendants Centurion and NaphCare regarding alleged deliberately indifferent policies concerning hernias, specialist consultations, and surgery (Count One); (2) an Eighth Amendment medical care claim against Defendant Thornell in his official capacity (Count One); (3) Eighth Amendment medical care claims against Defendants Shinn and Thornell in their individual capacities (Count One); (4) an Eighth Amendment medical care claim against Defendant Thomas (Count Three); and Eighth Amendment conditions-of-confinement claims against Defendants Bowers and Malone (Count Two). (Doc. 9.)

State Defendants move for summary judgment on the grounds that Plaintiff did not exhaust administrative remedies as required under 42 U.S.C. § 1997e(a) for his medical care claims against Defendants Shinn and Thornell in Count One, State Defendants were not deliberately indifferent to Plaintiff's Eighth Amendment rights, and State Defendants are entitled to qualified immunity. (Doc. 58.)[1]

Medical Defendants move for summary judgment on the grounds that Plaintiff's treatment was not deliberately indifferent, Plaintiff cannot show that a policy or custom caused a constitutional violation, punitive damages are not warranted, and there is no basis for injunctive relief. (Doc. 89.)[2]

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine

---

[1] Upon the filing of State Defendants' Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the requirements under Federal Rule of Civil Procedure 56 and set a briefing schedule. (Doc. 60.)

[2] Upon the filing of Centurion, NaphCare, and Thomas' Motion for Summary Judgment, the Court issued a second *Rand* Order. (Doc. 90.)

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine v. Fritz Co., Inc.*, 210 F.3d at 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions.

*Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

### III.    Procedural Issues

In their Reply, Medical Defendants argue that Plaintiff's Controverting Statement of Facts fails to comply with Local Rule of Civil Procedure 56.1(b) and the Court's *Rand* Order because his Controverting Statement of Facts (1) does not, in many instances, cite to evidentiary support for his factual assertions, (2) merely sets forth conclusory statements, and (3) includes citations to inadmissible hearsay. (Doc. 116 at 1–2.)

Under Local Rule of Civil Procedure 56.1(b), a party opposing a summary judgment motion must file a separate statement of facts that sets forth, for each of the movant's statements of facts, a correspondingly numbered paragraph indicating whether the nonmovant disputes the statement in each paragraph and a reference to the admissible evidence in the record that supports that nonmovant's position if a statement is disputed.

In his Controverting Statement of Facts, Plaintiff indicates whether he agrees or disputes each one of Medical Defendants' asserted facts, and he cites to parts of the record to support many of his disputes. (*See* Doc. 108.)  The Court agrees that some of Plaintiff's Controverting Statement of Facts is difficult to follow; however, a number of his asserted facts are supported by the record.  Moreover, because Plaintiff's Controverting Statement of Facts is verified, the Court considers Plaintiff's assertions within his Statement of Facts that are based on personal knowledge, whether or not Plaintiff cited to a part of the record. (*See* Doc. 108 at 21–22.)  Fed. R. Civ. P. 56(c)(4); *Jones*, 393 F.3d at 923; *see also S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms).  Construed liberally, Plaintiff more than sufficiently sets out disputes with Medical Defendants' factual assertions, and he supports his disputes with citations to the record or statements based on personal knowledge.  *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (directing district courts to "construe liberally motion papers and pleadings filed by pro se inmates and [ ] avoid applying summary judgment rules strictly").

- 4 -

Medical Defendants also argue that Plaintiff's Response Memorandum does not comply with the Rules of Procedure or the Court's *Rand* Order because he often fails to cite to support for his arguments, he relies on inadmissible and mostly irrelevant hearsay, and he relies on his own self-serving and conclusory declarations. (Doc. 116 at 2.)

That a declaration "is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999); *see Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (the district court cannot "disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature[,]" even if it is uncorroborated). Also, to survive summary judgment, the nonmovant "does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

Notably, Medical Defendants do not specifically object to any statement within Plaintiff's Memorandum or declaration, or to any specific paragraph within Plaintiff's Controverting Statement of Facts. (*See* Doc. 116 at 2.) The Court therefore has nothing specific to rule on regarding admissibility. Further, in opposition to summary judgment, the Court may consider evidence that, while inadmissible, may be produced in a form that would be admissible at trial. *See Block*, 253 F.3d at 418–19; *Fraser*, 342 F.3d at 1036–37; *Walters v. Odyssey Healthcare Mgmt. Long Term Disability Plan*, No. CV-11-00150-PHX-JAT, 2014 WL 4371284, at *3 (D. Ariz. Sep. 4, 2014) "[m]aterial in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment") (internal quotation omitted).

To the extent Medical Defendants argue that Plaintiff's Response Memorandum and Controverting Statement of Facts should not be considered due to a failure to comply with the Rules of Procedure or the Court's *Rand* Order, the arguments fail.

**IV.    Relevant Facts**[3]

On July 19, 2019, Plaintiff underwent double hernia surgery.  (Doc. 108 ¶ 2.)  At that time, Centurion was the contracted healthcare provider.  (Doc. 87 ¶ 1.)[4]

On January 31, 2020, Plaintiff submitted a Health Needs Request (HNR) asking to see a provider for pain issues; he reported sharp stomach pains and that his "hernia's burning." (Doc. 108-5 at 38.)

On March 28, 2020, Plaintiff submitted an Inmate Grievance in which he wrote that, following his July 19, 2019 double hernia surgery, he did not receive any follow up, and he suffered sharp, stabbing pain, cramps, and numbness in both hernia areas.  (Doc. 101-2 at 39.)  Plaintiff requested that his medical needs be addressed.  (*Id.* at 38–39.)

On July 10, 2020, Plaintiff submitted an HNR asking for help because both hernias were still causing pain, he had continuous sharp stomach pain by both hernia areas, and he had groin numbness.  (Doc. 101-6 at 25.)  The HNR response stating "PL," referring to the provider line.  (*Id.*)

On September 7, 2020, Plaintiff submitted an HNR stating that he was suffering painful urination and pain in his hernia areas.  (Doc. 108-3 at 11; Doc. 108-5 at 40; Doc. 101-6 at 26.)  Plaintiff also wrote that he had been submitting HNRs for a while about his chronic conditions without any responses.  (Doc. 108-5 at 40.)

On September 8, 2020, Plaintiff submitted another HNR stating that for two days he had been having urination difficulty and that, after he urinated, his bladder still felt full and it felt painful in his hernia areas.  (Doc. 101-4 at 40.)  Plaintiff was seen by Nurse

---

[3] Because both parties infuse argument and conclusory statements into their respective Statements of Facts when setting out their interpretations of the medical records, the Court has relied directly on the medical record evidence as much as possible.

[4] At the relevant time, Plaintiff was diagnosed with multiple chronic conditions, including but not limited to chronic pain syndrome and low back pain resulting from prior car accidents and a gunshot injury, where he was shot in the chest and the bullet exited through his spinal cord. (*See* Doc. 87-2 at 25; Doc. 87-4 at 2.) Plaintiff had regular chronic care visits for his chronic conditions, but the Court references only those medical records that relate to Plaintiff's hernia condition or involve a named Defendant.

Clarissa Ortiz that same day, and she noted, "provider contacted, provider will see." (*Id.* at 41.)

On October 28, 2020, Plaintiff submitted an HNR complaining about hernia pain. (Doc. 108-3 at 9.)  Plaintiff was seen that same day by Nurse Sarah Cartwright via telemedicine. (*Id.*)  Plaintiff was referred for an ultrasound of the stomach and to see a primary care provider. (*Id.* at 10.)

On November 27, 2020, Plaintiff submitted an HNR stating that he wrote to the Facility Health Administrator and submitted several HNRs for multiple chronic conditions, including hernia pain and that he was experiencing sharp pains. (Doc. 101-6 at 34.)

On January 10, 2021, Plaintiff submitted an emergency HNR stating that he had sharp stomach and groin pains from where his hernia surgery was done. (Doc. 101-6 at 21.)

On January 12, 2021, Plaintiff submitted an HNR stating he would like to be seen for sharp stomach and groin pain from his prior hernia sites. (Doc. 87-2 at 3.)  That same day, Plaintiff was seen by Nurse RaeLee Williams via telemedicine; Nurse Williams documented Plaintiff's report of sharp pains right under the xyphoid process (lowest tip of the sternum) and inguinal area and that it felt like it might be a knot. (*Id.*)  Nurse Williams documented a plan for Plaintiff to be seen on the provider line for his hernia issue, and she advised him to avoid lifting heavy things. (*Id.* at 7–8.)

On January 20, 2021, Plaintiff was seen by NP Angel Merriman. (Doc. 87-1 at 3.) NP Merriman noted that Plaintiff had a history of hernia issues and documented his reports of abdominal pain. (*Id.*)  NP Merriman noted that Plaintiff was wearing an abdomen binder. (*Id.*)  NP Merriman documented a plan to provide ibuprofen for Plaintiff's back pain. (*Id.* at 5.)

On March 6, 2021, Plaintiff submitted an Inmate Letter on which he wrote at the top "HNR." (Doc. 101-6 at 28.)  Plaintiff requested follow up for stomach and groin pain in the areas of his prior hernia surgeries. (*Id.*)  Plaintiff wrote that he had "sharp & shocking like, pricking pains in his stomach & groin areas where the two hernias were." (*Id.*)

On March 8, 2021, Plaintiff submitted an HNR stating he had stomach and groin pain with a history of hernia surgeries and he would like to be seen. (Doc. 101-4 at 31; *see* Doc. 101-5 at 50.)

On March 22, 2021, Plaintiff was seen by NP Merriman. (Doc. 87-1 at 7.) NP Merriman noted Plaintiff's history of hernia surgeries and report of stomach and groin pain. (*Id.*) Plaintiff reported abdominal pain in the upper central quadrant and that he had kept a journal but cannot correlate his pain to any food or position. (*Id.*) For Plaintiff's stomach pain, NP Merriman documented a plan to "avoid further trauma." (*Id.* at 9.)

On March 26, 2021, Plaintiff submitted an Informal Complaint Resolution in which he complained that when he saw NP Merriman, he explained that his daily stomach pain was so severe that at times he could not sleep. (Doc. 101-2 at 43.) Plaintiff wrote that Merriman determined there was a lump/knot in the center of his stomach and said it could be a hernia or something else but refused Plaintiff's request for an ultrasound or consult because, according to Merriman, Centurion would not approve anything and there was nothing she could do beyond prescribe ibuprofen. (Doc. 101-2 at 43.)

On April 6, 2021, Plaintiff had a health services encounter with Nurse Williams for gastrointestinal (GI) and other issues. (Doc. 101-4 at 29; Doc. 87-2 at 15.) Plaintiff was referred to the provider. (*Id.* at 19.)

On April 20, 2021, Plaintiff submitted an Inmate Letter, titled "HNR," stating that he had met with two providers via telemedicine and they recommended Roboxin and an ultrasound for his stomach pain. (Doc. 108-7 at 8.) Plaintiff wrote that NP Merrian felt the lump in Plaintiff's stomach but put it off and said she could not do anything because "they would deny it." (*Id.*) Plaintiff wrote that Merriman should have ensured he got an ultrasound, that he has not seen a provider for a while, and to please help. (*Id.*) On April 21, 2021, Nurse S. Jason issued an HNR response informing Plaintiff "if you have pain, symptoms, or changes to stomach please let us know." (Doc. 101-6 at 30.)

On April 23, 2021, Plaintiff had a health services encounter with Nurse James Callahan for GI issues. (Doc. 101-4 at 29; Doc. 87-2 at 23.) Nurse Callahan documented

that Plaintiff's stomach pain continued, though Plaintiff denied diarrhea and constipation. (Doc. 87-2 at 24.)  Nurse Callahan assessed "alteration in comfort r/t [related to] stomach pain" and noted that Plaintiff would be scheduled with a provider.  (*Id.* at 26–27.)

On April 30, 2021, Plaintiff submitted an HNR asking for follow up with the provider because he was in pain. (Doc. 101-6 at 35.)  Plaintiff wrote that telemed providers had recommended an ultrasound and he was still having bad pain in his stomach and the hernia surgery areas.  (Doc. 101-6 at 35.)  The May 3, 2021 HNR response stated "PL," referring to the provider line.  (*Id.*)

On May 5, 2021, Plaintiff saw NP Michael Brathwaite for abdominal pain.  (*Id.* at 19.)  NP Brathwaite assessed abdominal pain with history of ventral hernia repair and documented a plan to "continue meds as ordered."  (*Id.* at 20.)

On June 14, 2021, Plaintiff saw NP Siji Thomas, who noted Plaintiff's history of two hernia repair surgeries—one on the abdomen and one on the right inguinal area.  (Doc. 87-1 at 23.)  Thomas documented Plaintiff's report that for six months he had experienced pins and needles in the abdomen and inguinal area as well as stabbing pain.  (*Id.*)  Thomas assessed "possible GERD vs scar tissue from previous abdominal surgery."  (*Id.* at 24.)  Thomas documented a plan for omeprazole and to avoid spicy food, chocolate, and mint. (*Id.* at 25.)

On June 27, 2021, Plaintiff saw Nurse Sarah Cartwright via telemedicine after presenting to a nurse the night before with right side hernia stomach pain. (Doc. 101-5 at 5.)  Plaintiff stated that, due to his hernia, it is difficult to get to the top bunk, and his cellmate must assist him, and he requested a lower bunk "chrono." (*Id.*)  The entire medical record for this encounter was not provided, so it is not clear what, if any action, Nurse Cartwright took.  (*See id.*)

On July 16, 2021, Plaintiff submitted an HNR stating that he needed a stomach ultrasound due to a lump and sharp pain. (Doc. 101-6 at 36; Doc. 108-7 at 8.)  The July 16, 2021 HNR response stated "NL," referring to the nurse line. (Doc. 101-6 at 36.)  That same day, Plaintiff had a health services encounter with Nurse Sarah Cartwright for GI

issues via telemedicine.  (Doc. 101-4 at 29; Doc. 87-2 at 29.)  Nurse Cartwright noted that Plaintiff would be referred to the provider.  (Doc. 87-2 at 33.)

On July 21, 2021, Plaintiff saw NP Kendra Avant-Ortiz via telemedicine for reports of sharp pain "like a lightning strike in his abdomen."  (Doc. 87-1 at 27.)  Avant-Ortiz assessed stomach pain and documented a plan for a KUB—a kidney, ureter, and bladder x-ray—and, if the KUB was positive, to consider an ultrasound.  (*Id.* at 28–29.) NP Avant-Ortiz documented a plan for follow up for the results in 2–3 weeks.  (*Id.* at 29.)  At some point between then and August 15, 2021, Plaintiff had the KUB.  (*See* Doc. 101-6.)

On July 30, 2021, Plaintiff saw Defendant NP Thomas for low back pain. (Doc. 87-4 at 30.)  NP Thomas advised Plaintiff to stretch, continue taking Tylenol as needed, and that he may use a TENS unit.  (*Id.* at 32.)

On August 2, 2021, Plaintiff saw Defendant NP Thomas for chronic pain, high cholesterol, and a toenail fungus.  (Doc. 87-4 at 26.)

On August 15, 2021, Plaintiff submitted an HNR stating that he had not been advised of the x-ray result and whether it shows where his sharp stomach pain was coming from, and that NP Ortiz informed him that if the x-ray does not find it, she would order an ultrasound.  (Doc. 101-6 at 45; Doc. 108-7 at 8.)

On August 16, 2021, Plaintiff had a health services encounter with Sheila Sines for GI issues, but the accompanying record for this encounter is not found.  (Doc. 101-4 at 29.)

On August 23, 2021, Plaintiff saw NP Avant-Ortiz via telemedicine, at which time he reported continued ongoing, sharp, abdominal pain around the area of his hernia and requested an ultrasound.  (Doc. 87-1 at 31.)  Plaintiff complained of constant stomach pain to NP Ortiz. (Doc. 108 ¶ 6.) NP Avant-Ortiz noted that Plaintiff had a KUB, which showed only non-obstructive gas patterns.  (Doc. 87-1 at 31.)  NP Avant-Ortiz assessed abdominal pain and documented a plan to consult with the Site Medical Director to see if an abdomen ultrasound was warranted.  (*Id.* at 32–33.)

On September 25, 2021, Plaintiff saw NP Adolfo via telemedicine for epigastric (upper middle abdomen area) pain that had been ongoing for six months without any relief

from Omeprazole. (*Id.* at 35.) NP Adolfo assessed "epigastric pain – peptic ulcer vs h. pylori infection vs chronic pancreatitis." (*Id.* at 36.) NP Adolfo documented a plan to include diet modifications and follow up as needed. (*Id.* at 37.) NP Adolfo also ordered labs, which were negative for h. pylori. (Doc. 87-6 at 2–3.)

On October 14, 2021, Plaintiff saw Defendant NP Thomas for chronic back pain and pain medication. (Doc. 87-4 at 22.)

On November 16, 2021, Plaintiff saw Defendant NP Thomas for chronic back pain. (Doc. 87-4 at 18.)

On January 26, 2022, Plaintiff submitted an HNR stating that he would like to be seen for his hernia that is causing daily pain. (Doc. 108-7 at 8.) The medical records document "encounter held" on this date; however, the specific medical record showing an assessment or plan is not found. (*Id.*)

On February 4, 2022, Plaintiff saw Defendant NP Thomas for chronic neck and back pain. (Doc. 87-4 at 14.)

On March 17, 2022, Plaintiff saw Defendant NP Thomas for stomach pains and a back injury. (Doc. 101-3 at 16–17; Doc. 87-4 at 10.) NP Thomas only addressed Plaintiff's back injury pain and prescribed Cymbalta, despite Plaintiff's concern that he may be allergic to Cymbalta. (*Id.*) Plaintiff told NP Thomas that he believed he had a severe reaction to Cymbalta in the past and that she should check his chart, but she declined to do so. (Doc. 108-2 at 13.)

A couple days after taking Cymbalta, Plaintiff experienced blurred vision, itching, dizziness, vertigo, and difficulty with his motor skills. (Doc. 108-2 at 14.) On March 19, 2022, a Correctional Officer activated an ICS due to Plaintiff's worsening condition. (*Id.*) Plaintiff was taken to medical in a wheelchair and given a Benadryl injection to bring down severely elevated blood pressure. (*Id.* at 14–15.)

On March 29, 2022, Plaintiff saw Defendant NP Thomas to address the allergic reaction to Cymbalta. (Doc. 87-4 at 6.) NP Thomas noted that Plaintiff's allergy reactions went away after he stopped the Cymbalta. (*Id.*)

- 11 -

On April 19, 2022, Plaintiff saw Defendant NP Thomas for chronic pain related to back injuries. (Doc. 87-4 at 2.)

On April 29, 2022, Plaintiff submitted an HNR stating that he still had bad stomach pains "perhaps due to the long period with my double hernias before any surgery was done or something else & still no ultrasound as advised a long time ago." (Doc. 101-6 at 10.) The April 30, 2022 response informed Plaintiff that he was scheduled to be seen in the middle of May 2022. (*Id.*)

On May 26, 2022, Plaintiff submitted an HNR stating that he had requested to be seen for his constant stomach pain. (Doc. 101-5 at 1.)

On May 27, 2022, Plaintiff saw Nurse Johanna Grignani, who noted Plaintiff's report that he had hernia pain. (Doc. 87-2 at 35.) Nurse Grignani assessed "alteration in comfort related to pain," and referred Plaintiff to a provider. (*Id.* at 37, 39.)

On June 10, 2022, Plaintiff saw NP Sharon Kary via telemedicine for complaints of abdominal pain in the epigastric region for the past year. (Doc. 87-1 at 39.) NP Kary documented that Plaintiff complained of abdominal pain for one year, "epigastric region, 0/10 at this time, sharp, slowly subsides, occurs before eating or after eating, sharp pain occasionally wakes him up." (*Id.*) But Plaintiff states that he never reported a pain level at 0/10 because it was always at least 5/10 or higher, and he states he suffered pain all the time. (Doc. 108 ¶ 24.) NP Kary noted Plaintiff's history of a July 2019 abdominal surgery and history of inguinal hernia. (*Id.*) NP Kary ordered an abdominal x-ray. (Doc. 87-6 at 16.)

The abdominal x-ray showed nonspecific bowel gas and feces patterning with no acute disease identified in the abdomen. (*Id.*)

On July 7, 2022, Plaintiff saw NP Weigel for complaints of hernia pain in the left inguinal areas, but Weigel noted that no hernia was observed on examination. (Doc. 101-5 at 25.) NP Weigel noted Plaintiff's history of a right inguinal hernia. (*Id.*)

On July 12, 2022, Plaintiff submitted an HNR stating that the telemed provider had ordered blood work and a stomach x-ray for his sharp stomach pains, yet nothing had been discussed with him yet. (Doc. 101-5 at 27.)

On July 13, 2022, Plaintiff saw Nurse Anna Hernandez in response to his HNR. (Doc. 87-2 at 41.) Nurse Hernandez noted that Plaintiff was referred to the provider line. (*Id.* at 44.)

On July 21, 2022, Plaintiff saw NP Weigel, who documented that Plaintiff's abdomen was soft and nontender with good bowel sounds and there was no evidence of a hernia. (Doc. 101-4 at 13.)

Shortly after the July 21, 2022 appointment with NP Weigel, Plaintiff underwent an abdominal ultrasound. (Doc. 101-4 at 39.) The July 27, 2022 ultrasound report concluded "non-obstructive bowel gas pattern. No radiographic evidence of an obvious acute abdominal or pelvic abnormality. Further evaluation with an IV and oral contrast-enhanced CT of the abdomen and pelvis would be warranted for persistent clinical concern and/or worsening symptoms." (Doc. 87-6 at 14.)

On July 27, 2022, Plaintiff had an x-ray of the groin, which showed "apparent inguinal hernia, not containing bowel." (Doc. 87-6 at 18.)

On July 31, 2022, Plaintiff saw NP Weigel for follow up on the ultrasound report. (Doc. 101-4 at 39.) NP Weigel documented a plan for a hernia belt and to submit a consult to Rubicon (an online medical consultation service). (Doc. 87-1 at 53.) Plaintiff did not receive a hernia belt. (Doc. 108 ¶¶ 28, 56.)

On August 11, 2022, Plaintiff submitted an HNR complaining of inadequate medical care and he requested an MRI to determine the source of his stomach pain. (Doc. 101-4 at 47.)

On August 13, 2022, Plaintiff was seen by Nurse Alex Dutton via telemedicine. (*Id.*) Nurse Dutton documented that Plaintiff's chief complaint was abdominal pain, but the rest of the medical record for this encounter is not found. (*Id.*)

On August 26, 2022, Plaintiff saw NP Weigel for continuous abdominal pain for one year. (Doc. 101-5 at 45.) NP Weigel documented that Plaintiff reported pain at a 5/10 level; however, Plaintiff states his pain was actually at 10/10. (*Id.*; Doc. 108 ¶ 29.) NP Weigel noted a plan to prescribe Pantoprazole and refer Plaintiff for an abdominal ultrasound. (Doc. 101-5 at 46.)

On August 26, 2022, a consult request was submitted for an abdomen CT. (Doc. 101-4 at 35.) It appears no CT was ever done.

On or about September 8, 2022, Plaintiff underwent an abdominal ultrasound, which concluded "no ascites, cirrhosis, or hepatic mass." (Doc. 87-6 at 20.)

On September 22, 2022, Plaintiff submitted an HNR asking about the ultrasound results and stating that he still feels pain often. (Doc. 108-3 at 15.)

On October 1, 2022, NaphCare became the contracted healthcare provider for prisoners in ADCRR custody. (Doc. 87 ¶ 1.)

On October 12, 2022, Plaintiff submitted an HNR reporting stomach pain and requesting renewal of his current SNOs. (*Id.* at 87-5 at 61–62.)

On October 17, 2022, Plaintiff saw Defendant NP Thomas for his complaint of stomach pain. (*Id.* at 60–61.) Plaintiff reported bad stomach pain for over a year mostly in the upper and mid abdomen; pain that was lingering at times and sharp pain; pain level at 10/10; and "jolt and stabbing pain." (*Id.* at 61.) NP Thomas examined Plaintiff and felt the lump, which was the hernia. (Doc. 108 ¶ 31.) NP Thomas assessed "possible GERD vs gastritis vs PUD vs IBS vs Chron's [sic] disease vs ulcerative colitis," and ordered labs and Pantoprazole, Colace, Fibercon, and Dicyclomine (treats IBS). (Doc. 87-5 at 61.)

On October 17, 2022, Plaintiff submitted an HNR stating that he saw Defendant NP Thomas that morning for his stomach pain, and she informed him he had a urine infection, or UTI. (Doc. 101-6 at 46.) Plaintiff wrote that, according to his niece who is a nurse, the standard of care for a UTI with stomach pain is an MRI and antibiotics; however, NP Thomas did not provide any treatment or medication. (*Id.*) The HNR response stated, "sent to NaphCare for chart review & FHA Renna." (*Id.*)

Also on October 17, 2022, Plaintiff filed an Inmate Letter to complain about Defendant NP Thomas' lack of adequate treatment at that day's appointment. (Doc. 108-1 at 51.) Plaintiff wrote that, despite diagnosing Plaintiff with a UTI, NP Thomas provided no treatment apart from suggesting Tylenol and advising him to meditate, and Thomas discontinued Plaintiff's treatment prescribed by another provider for Plaintiff's neck and back pain. (*Id.*)

On November 7, 2022, Plaintiff saw Defendant NP Thomas. (Doc. 87-5 at 58–59.) NP Thomas documented that Plaintiff reported he still had pain in the left groin and left lower and mid abdomen; that the pain was occasional; and that he sometimes had stinging during urination. (*Id.* at 59.) But Plaintiff states that, at this time, his pain was constant and so severe it would wake him from sleep at times. (Doc. 108 ¶ 32.) In the "Plan" section of the medical record, NP Thomas wrote "possible IBS vs. dyspepsia vs malingering vs gastritis vs indigestion: will continue bowel care" with medications. (Doc. 87-5 at 59.)

On November 25, 2022, Plaintiff submitted an Informal Complaint Resolution stating that he had undergone multiple ultrasounds and been diagnosed by Dr. Weigel with a groin hernia. (Doc. 101-3 at 5.) Plaintiff requested to be seen by a specialist. (*Id.*)

On December 26, 2022, Plaintiff submitted an HNR requesting to see a physician about his hernia and last ultrasound. (Doc. 87-5 at 55–56.)

On January 13, 2023, Plaintiff saw Defendant NP Thomas and reported pain in the mid stomach for a year and in the left lower abdomen for the past three months, and constipation. (Doc. 87-5 at 53–54.) NP Thomas ordered labs and Tylenol for pain. (*Id.* at 54.) NP Thomas told Plaintiff that she could not recommend a consult to a hernia specialist. (Doc. 108 ¶ 34.)

On January 27, 2023, Plaintiff saw Defendant NP Thomas to follow up on labs. (Doc. 87-5 at 52–53.) Plaintiff again requested a GI/hernia consult. (Doc. 108 35.) NP Thomas noted Plaintiff's report of left lower abdominal pain for the prior 8 days along with bloating, fever, and vomiting, and chronic abdominal pain in mid abdomen for over a year.

(Doc. 87-5 at 53.)  At this time, Plaintiff was suffering excruciating pain whenever he used the bathroom.  (Doc. 108 35.)  NP Thomas ordered a fecal occult blood test.  (Doc. 87-5 at 53

On January 31, 2023, Plaintiff submitted an HNR stating that he was seen by Defendant NP Thomas, who informed him that he had blood in his stool sample and was going to schedule him to see a specialist but instead wanted another stool sample.  (Doc. 87-5 at 51–52.)  Plaintiff complained that he had experienced constant stomach pains for over a year now, yet NP Thomas refused to send him to a specialist or provide a known working pain management medication and instead advised Plaintiff to meditate.  (*Id.* at 52.)  Nurse Angela responded to the HNR and advised Plaintiff to provide a second stool sample and allow a blood draw so the provider can make referrals if necessary.  (*Id.*)  Nurse Johnson informed Plaintiff that he could submit an Inmate Letter to Medical Director Stewart regarding issues with medical care, but the nurse could not override the provider.  (*Id.*)

On March 1, 2023, Plaintiff saw Defendant NP Thomas.  (Doc. 87-5 at 48–49.)  NP Thomas noted that Plaintiff reported abdominal pain for over a year and sharp pains in the center of abdomen that comes and goes.  (*Id.* at 49.)  But Plaintiff states that his pain did not come and go but was constant—he was always in pain.  (Doc. 108 ¶ 36.)  In the "Plan" section of the medical record, NP Thomas wrote "possible IBS vs Chron's [sic] disease vs colitis vs colon cancer vs hemorrhoids vs diverticulitis; referred to GI for evaluation.  Will monitor."  (Doc. 87-5 at 49.)

On March 31, 2023, Plaintiff saw Defendant NP Thomas for a chronic care visit and to follow up on elbow pain.  (Doc. 87-4 at 35.)

On April 4, 2023, Plaintiff saw Dr. Nadir Abdul, a gastroenterologist.  (Doc. 87-7 at 2; *see* Doc. 101-4 at 28; *see* Doc. 87-5 at 45.)  Dr. Abdul noted that Plaintiff had suffered upper abdominal pain for over a year and had lost 20 pounds over the past year.  (Doc. 87-6 at 2.)  Dr. Abdul conducted a complete examination and ordered an abdomen and pelvis

CT with and without contrast, an upper endoscopy procedure (EGD), a colonoscopy, and labs. (*Id.* at 2–3.) Dr. Abdul also ordered follow up in 8 weeks. (*Id.* at 3.)

Shortly thereafter, NaphCare ordered an alternative treatment plan (ATP) in response to Dr. Abdul's order for imaging and procedures. (Doc. 87-3 at 4, Thomas Decl. ¶ 19.)

On April 21, 2023, Plaintiff saw Defendant NP Thomas for follow up on the ATP. (Doc. 87-5 at 43–44.) NP Thomas documented that she explained that the ATP recommended waiting until the diagnostic work up was done before further imaging. (*Id.* at 44.) But Plaintiff states that NP Thomas did not discuss the ATP with him. (Doc. 108 38.)

On May 2, 2023, Plaintiff underwent a stomach biopsy, which showed chronic active gastritis with H. pylori organisms. (Doc. 87-7 at 5.) Plaintiff also underwent an upper GI endoscopy, which was normal, and Dr. Abdul performed the colonoscopy, which was normal. (*Id.* at 6, 8, 10.)

On May 5, 2023, Plaintiff saw NP Jennifer Begner following the GI consult and colonoscopy. (Doc. 87-5 at 42–43.) Plaintiff reported abdominal pain, and NP Begner documented a plan for a CT without contrast. (*Id.* at 43.) It appears that no CT was done.

On May 9, 2023, Plaintiff saw Defendant NP Thomas for follow up on the gastroenterologist's recommendations. (Doc. 87-5 at 41–42.) NP Thomas noted that Plaintiff had an EGD and the biopsy was positive for H. pylori infection. (*Id.* at 42.) NP Thomas documented Plaintiff's report of abdominal pain and occasional constipation and diarrhea. (*Id.*) NP Thomas prescribed Doxycycline, Metronidazole, Pepto-Bismol, and Pantoprazole. (*Id.*)

On June 7, 2023, Plaintiff submitted an HNR stating that he saw a GI specialist a while ago for stomach issues and he wanted to know the specialist's recommendations. (Doc. 101-6 at 49; Doc. 101-7 at 33.) Plaintiff wrote that he was still having sharp stomach pains and it has been over a year and a half. (*Id.*) Plaintiff further wrote that NP Thomas

had diagnosed Plaintiff with IBS and Plaintiff's stool was still very dark green. (*Id.*) The HNR response stated, "Placed on NL," referring to nurse line. (*Id.*)

On June 9, 2023, Plaintiff submitted an Informal Complaint Resolution in which he wrote that he had suffered severe stomach pains daily, and he was finally taken to a GI specialist, who performed a colonoscopy and biopsy and diagnosed Plaintiff with a H. pylori infection. (Doc. 101-3 at 19.) Plaintiff wrote that he was prescribed antibiotics; however, it had been two weeks and he had not been given the antibiotics. (*Id.*)

On July 18, 2023, Plaintiff saw Defendant NP Thomas for a chronic care visit. (Doc. 87-4 at 41–42, 47.)

On July 21, 2023, Plaintiff submitted an HNR stating that he spoke to NP Thomas and she advised Plaintiff to (1) ask for information regarding the two brand names and serial numbers of the hernia mesh used in his 2019 hernia surgery and (2) inquire about renewal of a bottom bunk SNO. (Doc. 87-5 at 35–36.) The medical record notes that Plaintiff did not qualify for a bottom bunk SNO. (*Id.* at 36.)

On August 2, 2023, Plaintiff submitted an HNR asking to be seen for his lower right hernia and inquiring if he will be sent for a hernia consult. (Doc. 87-5 at 34.)

On August 7, 2023, Plaintiff filed an Informal Complaint Resolution stating that he was diagnosed with H. pylori, which comes from contaminated water. (Doc. 59-3 at 13.) Plaintiff wrote that, because the Unit's water is contaminated, he would like to know what kind of pipes were used for water flow, what kind of filters were used and where they were placed, and whether he could purchase a water purifier filter from the store or a vender. (*Id.*) The Informal Complaint Resolution response informed him that a water purifier filter is not available to purchase through the prison vendor. (*Id.*)

On or about August 9, 2023, Plaintiff filed a Formal Grievance regarding his request to purchase a water purifier filter because the water at the Eyman Complex has caused him injury. (*Id.* at 9.) The Formal Grievance Response informed Plaintiff that, as far as any medical claims he had, he must submit an HNR. (*Id.*)

On August 27, 2023, Plaintiff submitted an HNR requesting to be seen for various issues, including increasing stomach pains and a hernia consult. (Doc. 87-5 at 30–31.)

On September 6, 2023, Plaintiff saw PA Bellene Racowsky for a chronic care visit related to his back and neck pain. (Doc. 87-5 at 27–28.) PA Racowsky wrote in the record that Plaintiff also complained about an inguinal hernia he has had for 1 1/2 years with no nausea, vomiting, or pain, but he wanted it evaluated. (*Id.* at 28.) Plaintiff states that he told the PA he suffered daily, excruciating pain that woke him from sleep and he told her that he needed to see a specialist. (Doc. 108 ¶ 45.)

On September 11, 2023, Plaintiff saw Defendant NP Thomas for follow up on his inguinal hernia. (Doc. 87-5 at 27.) NP Thomas documented that Plaintiff reported having the hernia for 1.5 years; that he could push it back in; that he had stomach pains all the time; and that pain level was on and off at 6–7/10. (*Id.*) Plaintiff states that NP Thomas told him the hernia was reducible, which NaphCare considers elective surgery regardless of his symptoms and that NaphCare would not approve a consult or surgery unless the hernia burst or there was an emergency. (Doc. 108 ¶ 46.) At this time, Plaintiff had constant pain that affected his daily living, including urinating, sleeping, and sitting up. (*Id.*) NP Thomas assessed possible abdominal wall hernia, advised Plaintiff to avoid strenuous work outs, and ordered an ultrasound. (Doc. 87-5 at 27.)

On September 24, 2023, Plaintiff filed a grievance stating that the water at his unit was "toxic and/or contaminated" and that the water caused his medical issues. (Doc. 59-3 at 6.) Plaintiff requested that he be allowed to purchase directly from a vendor a water purifier or Bristol water purifier bottle or cup. (*Id.*) The response to this grievance, issued by Defendant Julie Bowers, informed Plaintiff that he provided no evidence to support the claim that water at the unit was unsuitable for drinking and that Defendant Sean Malone, Assistant Director for Prison Operations, had not responded to Plaintiff's request to purchase a water purifier. (*Id.* at 3.) Bowers informed Plaintiff that his complaint was forwarded to Fred Moreno, Assistant Director for Facilities, and, if he can answer questions

regarding the plumbing and water filtration at Eyman Complex, an amended response would be provided to Plaintiff.  (*Id.*)

On October 3, 2023, Plaintiff saw Defendant NP Thomas for a chronic care visit.  (Doc. 87-4 at 52–53.)  Also on this date, Plaintiff underwent an extremity ultrasound, which showed a left inguinal hernia.  (Doc. 87-8 at 4.)

On October 18, 2023, Plaintiff saw Defendant NP Thomas for his left inguinal hernia.  (Doc. 87-5 at 25–26.)  Plaintiff reported pain when walking, getting up, and sitting up; pain level at 9/10; that he cannot do anything; and that he had to hold his side when using the restroom.  (*Id.* at 26.)  In the "Plan" section of the medical record, NP Thomas noted "left inguinal hernia: referred to general surgery for evaluation and treatment."  (*Id.*)

On November 14, 2023, Plaintiff saw Dr. Gregory Robertson, a surgeon.  (Doc. 87-7 at 13.)  Dr. Robertson noted Plaintiff's 2-year history of increasing discomfort associated with a left groin bulge and conducted a history and complete examination.  (*Id.* at 13–14.)  Plaintiff explained to Dr. Robertson that the hernia above his belly button would not push in or out.  (Doc. 108 ¶ 50.)  Dr. Robertson assessed a left inguinal hernia that needed repair and a possible recurrence of a right inguinal hernia that, if necessary, could be repaired at the same time.  (Doc. 87-7 at 14.)

On December 14, 2023, Plaintiff submitted an HNR stating that he was having severe pains in his mid-stomach that woke him up from sleep, he had constant pain, and it felt like when he had the H. pylori infection.  (Doc. 108-6 at 32.)  Plaintiff also inquired whether his hernia surgery had been approved.  (*Id.*)

On the night of December 27, 2023, Plaintiff had an emergency medical ICS due to excruciating stomach pains.  (Doc. 108 51–52; Doc. 87-10 at 2–4.)  Plaintiff was given Protonix, Tylenol, Loperamide, and Bentyl.  (Doc. 87 ¶ 51.)

On January 11, 2024, Plaintiff saw Nurse Jetta Valle, apparently as follow up to the ICS.  (Doc. 87-5 at 19–20; Doc. 87 ¶ 51.)  Plaintiff complained of pain in the epigastric and right upper quadrant areas.  (Doc. 87-5 at 20.)

On January 24, 2024, Plaintiff underwent a left inguinal hernia repair surgery. (Doc. 101-8 at 3; Doc. 87-5 at 17.) Dr. Robertson recommended follow up in the office 1–2 weeks later. (Doc. 87-7 at 16, 22.)

On January 26, 2024, Plaintiff developed a sudden increase in pain with dysuria (pain, burning, or discomfort during urination) and he was sent to the emergency room for evaluation. (Doc. 87-5 at 11; Doc. 87-7 at 53.) The hospital discharged Plaintiff and recommended a urology follow up in one week. (Doc. 87-5 at 11.)

On February 20, 2024, Plaintiff had an off-site surgery follow up. (Doc. 87-5 at 6; Doc. 87-7 at 48–49.) Dr. Robertson conducted an examination and recommended scrotal support, elevation of scrotum on rolled towels when supine, and a heating pad or hot patches for use in area of abdominal wall. (*Id.* at 49–50.)

Upon his return to the prison, Pamela Olmstead documented in Plaintiff's medical record that a jock strap was ordered but that she "disagree[d] with heating pad/hot pad" recommendation because those items for comfort were not available in a close/max custody yard and were not medically necessary; rather, Plaintiff could use a warm compress/towel for scrotal swelling. (Doc. 108-6 at 22.)

On March 7, 2024, Plaintiff saw an offsite urologist, Dr. Anthony Woodruff, for testicular pain and swelling. (Doc. 87-11 at 2–3.) Dr. Woodruff noted that Plaintiff's pain was improving, and the swelling had resolved. (*Id.* at 3.) Dr. Woodruff explained that he was not an expert in management of postoperative hernia repair. (*Id.*) Dr. Woodruff found no infectious or malignant explanation for the testicular pain, and he recommended sitz baths, scrotal support, NSAIDs, and to avoid excessive manipulation. (*Id.*)

On March 8, 2024, the scrotal support/athletic supporter was delivered to the yard. (*Id.* at 21–22.)

**V.    Summary Judgment Based on Exhaustion**

State Defendants argue that Plaintiff did not exhaust administrative remedies for his claims regarding inadequate medical care against Defendants Shinn and Thornell in Count One. (Doc. 58 at 9.)

- 21 -

### A.    Legal Standard

Under the PLRA, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934–35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014).

Failure to exhaust is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204 (2007). The defendant bears the burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino*, 747 F.3d at 1172; *see Brown*, 422 F.3d at 936–37. If the defendant can make that showing, the plaintiff must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.*

### B.    Discussion

State Defendants assert that the ADCRR grievance process is set out in Department Order (DO) 802, *Inmate Grievance Procedure*. (Doc. 59 1.) In support of their exhaustion argument, State Defendants submit the copy of DO 802 that was in effect at the time Plaintiff's claims arose. (Doc. 59-1 at 2–3 (Do 802 "Effective Date: March 2, 2022").) But State Defendants did not submit all of the relevant pages of DO 802; they submitted only pages 1, 3, 4, 6, and 10 of the policy. (*See id.* at 3–7.) Although the Court can take judicial notice of government websites, the version of DO 802 available on the ADCRR

website became effective on May 12, 2025, after Plaintiff's claim arose and after he used the ADCRR grievance process; thus, it is not applicable to exhaustion in this case.[5]

The portion of DO 802 submitted by State Defendants shows that, for a complaint regarding medical care, a prisoner must submit an Informal Complaint Resolution, to which the contract Assistant Director of Nursing must respond within 15 days. (Doc. 59-1 at 5.) The portion of DO 802 submitted by State Defendants does not include any other information regarding what further steps a prisoner may take after the Assistant Director of Nursing's response because, presumably, that information is on the pages omitted by State Defendants. (*See id.* at 5–7.)

To show a failure to exhaust, the movant has the burden to demonstrate that pertinent relief remained available through the prison's grievance process. *Brown*, 422 F.3d at 436. Relevant evidence to make this showing includes "statutes, regulations, and other official directives that explain the scope of the administrative review process; [and] documentary or testimonial evidence from prison officials who administer the review process[.]" *Id.* at 936–37. State Defendants fail to provide a complete copy of DO 802, and they submit no other regulations or official directives that explain the steps in the administrative remedy process for a complaint related to medical care. Nor do State Defendants submit a declaration of a prison official describing the steps in the ADCRR grievance process. (*See* Doc. 59.) State Defendants' incomplete copy of DO 802, without more, is insufficient to establish that the prison had an available grievance process, that relief remained available to Plaintiff through this grievance process for his claims regarding inadequate medical care in Count One, and that Plaintiff failed to exhaust the steps in the grievance process. *See Albino*, 747 F.3d at 1172; *Wyatt v. Terhune*, 315 F.3d 1108, 1120 & n.15 (9th Cir. 2003) (finding the defendants' documents inadequate to establish that the plaintiff failed to exhaust), *overruled in part on other grounds by Albino*, 747 F.3d 1162.

---

[5] *See* DO 802, Inmate Grievance Procedure, https://corrections.az.gov/sites/default/files/documents/policies/800/DO%20802%20-%20Eff.%205-12-25.pdf

- 23 -

Because State Defendants fail to meet their initial evidentiary burden, the Court need not consider Plaintiff's Response. *See Nissan Fire*, 210 F.3d at 1102–03. State Defendants' Motion will be denied on the issue of exhaustion.

## VI. Summary Judgment on the Merits

### A. Counts One and Three-Medical Care

#### 1. Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. A prison official is deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk to inmate health." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting

*Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).  But a prisoner need not show that his harm was substantial.  *Jett*, 439 F.3d at 1096.

### 2.   Discussion

#### a.   Serious Medical Need

State Defendants do not address the first prong in the deliberate indifference analysis—whether Plaintiff's condition constituted a serious medical need.  (*See* Doc 58.)  Medical Defendants state only that "it was initially determined that Plaintiff did not have a serious medical need requiring surgery[.]"  (Doc. 89 at 16.)

The evidence, construed in Plaintiff's favor, shows that, beginning in January 2020, Plaintiff began reporting pain, including sharp, stabbing pain in the areas where he previously had hernias.  (*See* Doc. 108-5 at 38; Doc. 101-2 at 39.)  For the next three years, Plaintiff continued to suffer sharp and stabbing pain in the stomach and groin, daily pain so severe that it interfered with his sleep, difficulty and pain urinating, excruciating pain at 10/10 levels, pain all the time, and pain that affected his activities of daily living.  (*See, e.g.*, Doc. 101-6 at 21, 26; Doc. 101-4 at 40; Doc. 101-2 at 43; Doc. 87-1 at 23; Doc. 87-5 at 27, 61; Doc. 108-7 at 8; Doc. 108 24, 29, 32, 35, 45, 46.)  This evidence supports that Plaintiff's condition constituted a serious medical need.  *See McGuckin*, 974 F.2d at 1059–60; *Jones v. Johnson*, 781 F.2d 769, 771–72 (9th Cir. 1986) (recognizing that a painful hernia constitutes a serious medical need requiring treatment).

### b.    Deliberate Indifference-Individual Capacity Claims

The second prong in the analysis examines whether Defendants' were deliberately indifferent to Plaintiff's serious medical need.  The inquiry into an individual defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976).

### i.    Directors Shinn and Thornell

A supervisor may be liable in his individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652 F.3d 1202 (9th Cir 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct."  *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  In other words, a supervisor can be liable for creating policies and procedures that violated a plaintiff's constitutional rights.  *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).  The sufficient causal connection "may be shown by evidence that the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights[.]'"  *Hansen v. Black* , 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted).

In addition, "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help.'"  *Peralta*, 744 F.3d at 1085–86 (quoting *Jett*, 439 F.3d at 1098).

State Defendants argue that the Eighth Amendment claim against Defendants Shinn and Thornell must be dismissed because Plaintiff cannot show Shinn or Thornell were aware of or reviewed Plaintiff's grievances about medical treatment; thus, there is no showing that either Defendant was subjectively aware of a risk of serious harm to Plaintiff

and consciously disregarded that risk.  (Doc. 58 at 10–11.)

In response, Plaintiff does not claim that Shinn or Thornell created or implemented a deficient policy that led to the denial of adequate medical care.  Instead, he claims that Shinn and Thornell were aware of Plaintiff's serious medical needs and the denial of care and failed to respond or correct the deficiencies.  (Doc. 103 at 9–11.)  Plaintiff asserts that throughout the relevant time, there was ongoing litigation, articles, and court testimony about the inadequate medical care at ADCRR, and Plaintiff submitted grievances seeking help for his pain and suffering, which he argues put Defendants Shinn and Thornell on notice of the healthcare providers' failures.  (*Id.* at 10.)  Plaintiff further argues that these Defendants were aware of the inadequate medical care via reports, HNRs, and hospital records but they disregarded the issue or refused to correct the harm and, consequently, the depravations continued.  (*Id.* at 11, 13–14.)

There is no evidence that Defendants Shinn and Thornell, as ADCRR Directors and nonmedical officials, had access to and reviewed Plaintiff's HNRs, hospital records, and medical reports such that they would have known of Plaintiff's hernia condition and ongoing pain at the relevant time.

In support of his claim that he filed grievances that put Shinn and Thornell on notice of his condition and the inadequate medical care, Plaintiff cites to Exhibit 2A, which he labeled "Grievance Log."  (Doc. 103 at 10; Doc. 101-2 at 31.)  Exhibit 2A consists of 62 pages of grievance documents.  (Doc. 102-2 at 31–49; Doc. 102-3 at 1–45.)  Plaintiff does not cite a page number within Exhibit 2A, nor does he refer to a grievance number or even the dates of grievance documents that may support his claim.  (*See* Doc. 103 at 10.)  This is not sufficient.  Federal Rule of Civil Procedure 56(c)(1) requires a party to support any factual assertion by citing to "particular parts of the materials in the record."  The Court is "not required to comb the record" to find supporting evidence.  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("[j]udges are not like pigs, hunting for truffles buried in briefs") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Thus,

"[g]eneral references without page or line numbers are not sufficiently specific." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Plaintiff fails to identify the litigation or submit copies of the articles or court testimony that purportedly put Defendants Shinn and Thornell on notice of inadequate medical care. Nor does Plaintiff show how other litigation and articles regarding inadequate medical care at ADCRR would have put Defendants Shinn and Thornell on notice of Plaintiff's medical condition and the alleged denial of care for his hernias and severe pain. Plaintiff's general and conclusory assertions are insufficient to show that these Defendants were subjectively aware of Plaintiff's serious medical need and disregarded it. *See Comprehensive Med. Ctr., Inc. v. State Farm Mutual Auto. Ins.*, 690 F. Supp. 3d 1104, 1114 (C.D. Cal. 2023) ("conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of material fact and defeat summary judgment"); *see also Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere . . . speculation [does] not create a factual dispute for purposes of summary judgment") (citation omitted).

On this record, Defendants Shinn and Thornell cannot be liable in their individual capacity for deliberate indifference to Plaintiff's serious medical needs.[6] Summary judgment will be granted as to this claim in Count One.

### ii.    NP Thomas

Medical Defendants argue that Defendant Thomas was not deliberately indifferent to Plaintiff's serious medical need because she provided medically acceptable care based on her diagnoses and Plaintiff's "actual symptoms," provided appropriate medications, and submitted an outside consult when Plaintiff's condition "actually worsened." (Doc. 89 at 16.)

The evidence shows that, by the time Defendant NP Thomas saw Plaintiff in June 2021, Plaintiff had been submitting HNRs and been reporting sharp stomach and groin

---

[6] In light of this finding, the Court need not address State Defendants' argument for qualified immunity as to Thornell. (*See* Doc. 58 at 13–14.)

pain, hernia pain, severe pain, and painful urination for over a year. The Court infers that NP Thomas was aware of Plaintiff's HNRs and reports of pain. *See Jett*, 439 F.3d at 1094, 1097 (finding that as the party opposing summary judgment, the plaintiff was entitled to an inference that the defendant prison doctor was aware of information in the plaintiff's medical record and aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb). In response this medical history, and in response to Plaintiff's new report of stabbing pain for the prior 6 months, NP Thomas's prescribed Prilosec and advised Plaintiff to avoid spicy food. (Doc. 87-1 at 23, 25.) Thereafter, Plaintiff continued to report sharp, stabbing, hernia pain, and that the Prilosec provided no relief, but when NP Thomas saw Plaintiff for stomach pains and a back injury in March 2022, NP Thomas did not address Plaintiff's stomach pain. (Doc. 101-3 at 16–17; Doc. 87-4 at 10.) *See Jett*, 439 F.3d at 1096 (deliberate indifference shown where an official fails to respond to a prisoner's pain and the prisoner suffers harm as a result).

Although Defendant NP Thomas did not see Plaintiff consistently, when she saw him again in November 2022, it was evident from the medical records and Plaintiff's numerous HNRs that the conservative course of treatment Plaintiff had received for his stomach and groin pain was not effective. *See Jett*, 439 F.3d at 1097. The parties dispute the level of pain Plaintiff reported at this encounter. (Doc. 87-5 at 59; Doc. 108 ¶ 32.) The Court must take as true on summary judgment Plaintiff's assertion that his pain was constant and so severe it interfered with sleep. (Doc. 108 ¶ 32.) Plaintiff's 2020, 2021, and 2022 medical records and HNRs—of which NP Thomas was aware—showed complaints of severe stomach and groin pain for going on two years. The medical records showed that Plaintiff's treatment during this time included ibuprofen, Tylenol, Prilosec, and other GERD medications and that these medications were ineffective. The records also showed that labs and a KUB did not indicate a source of pain, but a July 2022 x-ray documented an apparent left inguinal hernia. In response to this information, NP Thomas made a list of differential diagnoses that did not include a hernia—she assessed possible

IBS, gastritis, indigestion, or "malingering." (Doc. 87-5 at 59.) NP Thomas's treatment plan for Plaintiff's ongoing, severe, and constant pain was to continue with the same, ineffective medications. (*Id.*) *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the prisoner's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the prisoner's] situation"). It would be another year before NP Thomas referred Plaintiff for hernia surgery.

Defendant NP Thomas's treatment, which consisted primarily of monitoring, prescribing some medications or maintaining Plaintiff's current medications, and, according to Plaintiff, advisements to meditate, may have been appropriate had Plaintiff not been suffering ongoing and severe pain for years and if the medications had been efficacious. To the extent Medical Defendants claim that Plaintiff's pain was only "general" and "intermittent," that is a material fact disputed by Plaintiff. (Doc. 89 at 17.) NP Thomas's differential diagnosis of malingering—even after an ultrasound showed an apparent hernia—suggests that NP Thomas did not take Plaintiff's condition seriously and disregarded his pain. *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 937–38 (N.D. Cal. 2010) ("[s]uspicions of malingering may . . . be considered an indication of an ulterior motive whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in failing to provide proper care"); *see Egberto v. Nev. Dep't of Corrs.*, 678 F. App'x 500, 503 (9th Cir. Feb. 6, 2017) (the doctor's challenge as to the source and extent of the prisoner's pain and the doctor's opinion that the prisoner was malingering "only creates a factual question for the jury to resolve").

On this record, a reasonable jury could find that NP Thomas exhibited deliberate indifference to Plaintiff's serious medical needs. *See Jett*, 439 F.3d at 1096 (failure to respond to a prisoner's severe pain for months may amount to deliberate indifference); *Hathaway*, 37 F.3d at 68.

As to the harm element, Plaintiff states that he suffered severe and constant pain for years, and that his pain affected routine daily activities, including walking, running,

coughing, urinating, and defecating.  (Doc. 107 at 3, 8–9.)  A reasonable jury could believe Plaintiff's allegations and find that he suffered harm as a result of Defendant NP Thomas's deliberate indifference.  *See Estelle*, 429 U.S. at 103; *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action). Accordingly, Medical Defendants' Motion for Summary Judgment will be denied as to the individual capacity claim against NP Thomas in Count Three.

**c.      Policy Claim Against Centurion and NaphCare**

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), to private entities acting under color of law).  Under *Monell*, a plaintiff must show that (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

**i.      Constitutional Injury**

Medical Defendants argue generally that Centurion and NaphCare staff "were consistently responsive to Plaintiff's needs, as evidenced by numerous evaluations, imaging and labs, as well as a steady regimen of pain management[.]"  (Doc. 89 at 15.) Medical Defendants conclude that there is no evidence that Centurion or NaphCare staff purposefully failed to respond to Plaintiff's symptoms or withheld treatment.  (*Id.*)

The Court has already determined there is a question of fact whether Defendant NP Thomas exhibited deliberate indifference to Plaintiff's serious medical need and caused Plaintiff to suffer harm as a result.

- 31 -

With respect to the conduct of other Centurion staff, the record shows that, despite Plaintiff's numerous HNRs reporting sharp and stabbing stomach and groin pain, severe pain, and difficulty urinating, Plaintiff went for a year—January 2020–January 2021—before he saw a Centurion provider. (*See* Doc. 108-5 at 9, 39; Doc 101-2 at 39; Doc. 101-3 at 11; Doc. 101-6 at 34, 39; Doc. 108-3 at 11; Doc. 101-6 at 34; Doc. 87-2 at 3; Doc. 87-1 at 3 (Jan. 20, 2021 encounter with NP Merriman).)  He also went for weeks at a time between HNRs without evidence he saw medical personnel, even when notations such as NL or PL suggest he was to see a nurse or provider.  Delays in treatment can constitute deliberate indifference.  *See Wood*, 900 F.2d at 1334

For the next almost two years, while Plaintiff continued to repeatedly seek care for severe pain, Centurion treated Plaintiff with either nothing, advisements to "avoid further trauma," Roboxin and Prilosec, labs, and an x-ray and ultrasound.  (*See* Doc. 87-1 at 5, 9, 16, 25, 28–29; Doc. 108-7 at 8; Doc. 101-4 at 39; Doc. 87-6 at 2–3; Doc. 108 32–33.)  But medical staff made no adjustments to Plaintiff's treatment when the prescribed medications proved ineffective.  When NaphCare took over in November 2022, Plaintiff was prescribed medications for GERD and suspected of malingering.  (*See* Doc, 87-5 at 26, 59, 61.)  As stated, Plaintiff was not referred to a surgeon until October 2023.  During this entire time, Plaintiff suffered ongoing severe pain and difficulty urinating.  On this record, a reasonable jury could find that Medical Defendants failed to competently treat Plaintiff's serious medical need.  *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner does not have to prove that he was completely denied medical care).  *Stocker v. Nevada*, No. 3:23-cv-00634-MMD-CLB, 2024 WL 4112299, at *3 (D. Nev. Aug. 12, 2024) ("if the prison's medical staff is not competent to examine, diagnose, and treat inmates' medical problems, they must 'refer prisoners to others who can'") (quoting *Hoptowit*, 682 F.2d at 1253).

Medical Defendants cite to cases holding that prison medical personnel did not act with deliberate indifference when they provided medications, hernia belts, and monitoring

in lieu of surgery for reducible hernias. (Doc. 89 at 17–18 n.3.) But they do not show that any of the cases are analogous to the instant case; specifically, the cited cases do not involve plaintiffs who suffered ongoing and severe pain and difficulty urinating for over a year without relief from medications. The plaintiff in *Hamby v. Hammond* initially reported sharp pains in certain circumstances but then rated his pain at 3/10 and "random." 821 F.3d 1085, 1988 (9th Cir. 2016). The record showed that the plaintiff's activities of daily living were not impaired, he did not have continual pain, and his hernia pain subsided for several months. *Id.* at 1089–90. In *Brown v. Beard*, the Third Circuit found that the prison's treatment for the plaintiff's hernia was at worst negligent, and there is no record showing that the plaintiff was in pain, much less severe pain, for a long period time. 445 F. App'x 453, 455 (3d Cir. 2011). In *Webb v. Hamidullah*, the plaintiff made numerous complaints of pain; however, the Fourth Circuit found that his complaints focused largely on work assignments, that prison medical staff did not ignore his complaints, and that medical staff monitored his hernia. 281 F. App'x 159, 162–63 (4th Cir. 2008).[7] In *Anderson v. Bales*, the Seventh Circuit found that the plaintiff failed to present evidence challenging the prison doctor's judgment that his hernia could not be treated adequately with non-surgical measures. 2013 WL 1278122, at *1 (7th Cir. 2013). There is no indication that the plaintiff in *Anderson* suffered pain for an extended period of time. *See id.* And in *Rossi v. Nevada Department of Corrections*, the Ninth Circuit held that the plaintiff failed to raise a genuine issue of material fact as to whether the prison disregarded a serious risk to his health. 390 F. App'x 719, at *1 (9th Cir. Aug. 2, 2010). There is no indication that the plaintiff in *Rossie* suffered pain for an extended period of time. *See id.* Contrary to these cases, Plaintiff suffered severe pain from 2020 through 2023 without any relief from medications. (*See* Doc. 107 at 3.) The cited case law therefore does not support

---

[7] Notably, in *Webb*, the prison sent the plaintiff to two different surgeons, who both recommended hernia surgery, but the prison determined that surgery was elective and not urgent. 281 F. App'x 159, 162–63. In the Ninth Circuit, such facts may support a disputed factual issue regarding deliberate indifference because failure to comply with a treating specialist's recommendations can amount to deliberate indifference. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014).

Medical Defendants' Motion.

In sum, there are genuine issues of material fact whether the delays in care in treating Plaintiff's severe pain and the lack of effective treatment over time amounted to deliberate indifference, and whether Plaintiff suffered harm as a result. Thus, the first element in the *Monell* test is satisfied.

### ii.    Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amount to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4,

- 34 -

2006).

Defendants contend there is no evidence of a policy or custom to deny care and no evidence that medical staff's decisions regarding Plaintiff's care were based on any Centurion or NaphCare policy or custom to deny or delay medically needed surgery for hernias.  (Doc. 89 at 19.)

As mentioned, Plaintiff began requesting medical care in January 2020 and filed numerous HNRs describing sharp, stabbing stomach and groin pain and painful urination. The evidence shows that multiple different nurses repeatedly referred Plaintiff to the provider line, but he did not see a provider until January 2021.  Defendant Centurion presents no explanation for this substantial delay in seeing a provider.  A reasonable jury could find that this year long period of repeated, unheeded referrals to a provider constituted a policy or custom to delay care.  *See Oyenik*, 2017 WL 2628901, at *2.

Once Plaintiff was able to see different providers, they provided ineffective treatment—or no treatment at all—in response to Plaintiff's severe pain and hernia symptoms.  The Court has already determined there are triable issues of fact whether the delays in care and ineffective treatment by Centurion and then NaphCare providers constituted deliberate indifference.  The failures to adequately address Plaintiff's pain and hernia symptoms did not result from the actions of just NP Thomas; rather, they occurred over time and involved multiple Centurion and NaphCare providers, which supports a finding of a policy.  *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation).

Finally, Plaintiff stated that, in 2021, when Plaintiff requested a consult for his hernia symptoms, NP Merriman informed him that Centurion would not approve anything. (Doc. 101-2 at 43.)  Plaintiff stated that NP Thomas later informed him that NaphCare considers surgery for reducible hernias to be elective regardless of symptoms; thus, NaphCare would not approve a consult or surgery unless there was an emergency.  (Doc. 108 46.)  In his verified Memorandum, Plaintiff avers that, in addition to NPs Merriman

and Thomas, NPs Gay, Weigel, and Ortiz advised him that Centurion and NaphCare's practice and unwritten policy was to delay or deny procedures and specialist consults because hernia surgery is considered elective. (Doc. 107 at 5.) Plaintiff further averred that all NPs informed him that any requests/consults are reviewed by someone who has never evaluated Plaintiff and they will always recommend alternative treatment. (*Id.*) These statements support that the providers were acting pursuant to policy when they refused to make referrals for a surgery consult for Plaintiff despite his pain and hernia symptoms.

In light of the above, there are genuine issues of material fact whether Defendants Centurion and NaphCare had policies or customs to delay adequate treatment for serious medical needs and to delay surgery referrals.

### iii.    Deliberately Indifferent Policy/Moving Force

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Medical Defendants argue Plaintiff cannot establish the "moving force" element because there was no deliberately indifferent treatment by medical staff. (*See* Doc. 89 at 19.)

The Court has already found genuine issues of material fact whether medical staff acted with deliberate indifference to Plaintiff's serious medical need and whether there existed a policy or custom of delaying adequate treatment and surgery referrals for a serious medical need. An obvious consequence of such policies or customs may be the denial of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Based on the above, there exists questions of fact whether Defendants Centurion and NaphCare had deliberately indifferent policies or customs that deprived Plaintiff of his

constitutional right to adequate medical care.  Summary judgment will be denied as to the policy claims against Defendants Centurion and NaphCare on Count One.

### d.    Official Capacity Claim Against Thornell

Because Naphcare is not entitled to summary judgment for its allegedly deliberately indifferent medical care as ADCRR's current contracted healthcare provider, and the ADCRR Director is the state official charged with caring for prisoners' needs under Arizona law, Ariz. Rev. Stat. § 41-1604, the Court will also deny summary judgment to Defendant Thornell in his official capacity for purposes of any potential injunctive relief. Plaintiff's official capacity claim against Thornell is, in effect, a claim against the State, which has Eleventh Amendment immunity, so Plaintiff is not entitled to damages on this claim.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  State officials may, however, be sued in their official capacities for prospective injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), 473 U.S., 159, 167, n.14 (1985) (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *Flint v. Dennison*, 488 F.3d. 816, 825 (9th Cir. 2007) ("a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity").

### e.    Injunctive Relief

Medical Defendants argue there is no basis for injunctive relief because Plaintiff already saw a gastroenterologist, and he received hernia surgery on January 24, 2024. (Doc. 89 at 20.)

Plaintiff has not been released from custody and remains reliant on Defendant NaphCare for his medical care.  In his November 2025 Response Memorandum, Plaintiff indicated that he was experiencing stomach pain.  (Doc. 107 at 12.)  Because summary judgment is denied herein as to the policy claim against NaphCare, and because the briefing is insufficient to show Plaintiff's current condition and NaphCare's current conduct, Plaintiff's request for injunctive relief is not moot.  *See Farmer*, 511 U.S. at 828 (whether

injunctive relief is appropriate "should be determined in light of the prison authorities' current attitudes and conduct") (internal quotation omitted).  Medical Defendants' request to dismiss the request for injunctive relief is denied.

### f.    Punitive Damages

Medical Defendants argue summary judgment is warranted on Plaintiff's request for punitive damages because the circumstances do not warrant it.  (Doc. 89 at 20.)

A request for punitive damages is not a separate claim, but rather a request for a particular relief as to Plaintiff's Eighth Amendment claim.  Whether punitive damages are warranted is an issue reserved for the jury.  *See Pacific Mut. Life Ins. Co. v. Haslip*, 111 U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case") (quotation omitted); *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  A jury may assess punitive damages in a § 1983 action when a defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith*, 461 U.S. at 56.

A reasonable jury could conclude that conduct by Medical Defendants was motivated by a "reckless or callous indifference to the federally protected rights of" Plaintiff, thereby warranting punitive damages.  *Id.*  The request for summary judgment as to punitive damages will therefore be denied.

### B.    Count Two-Conditions of Confinement

#### 1.    Legal Standard

The Eighth Amendment protects prisoners from inhumane conditions of confinement.  *Farmer*, 511 U.S. at 833; *Thomas v. Ponder*, 611 F.3d 1144, 1151–52 (9th Cir. 2010); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010).  Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety.  *See Farmer*, 511 U.S. 825.

Two requirements must be met to show an Eighth Amendment violation.  *Farmer*,

511 U.S. at 834. "First, the deprivation must be, objectively, sufficiently serious." *Id.* (internal quotation marks and citation omitted). The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2006). Exposure to toxic substances can support a claim under § 1983. *See Wallis v. Baldwin*, 70 F.3d 1074, 1076–77 (9th Cir. 1995) (exposure to asbestos); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (exposure to environmental tobacco smoke).

Second, "prison officials must have a sufficiently culpable state of mind," which for conditions of confinement claims, "is one of deliberate indifference." *Farmer*, 511 U.S. at 834 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to prisoner health or safety. *Id.* at 837.

### 2.    Discussion

State Defendants do not present any argument as to whether the drinking water at Plaintiff's Unit was tainted or toxic such that it constituted an objectively, sufficiently serious deprivation. (*See* Doc. 58.) Instead, State Defendants argue that Plaintiff cannot satisfy the second prong in the deliberate indifference analysis because he cannot show that Defendants Bowers and Malone were subjectively aware of the serious risk to Plaintiff's health. (*Id.* at 10–11.) Plaintiff contends that Defendants Bowers and Malone were put on notice of chemicals in the water through his letters, grievances, and HNRs. (Doc. 103 at 9–10.)

As stated, in September 2023, Plaintiff filed a grievance complaining that the toxic or contaminated water at his Unit caused his medical issues. (Doc. 59-3 at 6.) In her Grievance Appeal Response, Defendant Bowers informed Plaintiff that he presented no evidence to support the claim that water at the unit was unsuitable for drinking and that Defendant Malone, the Assistant Director for Prison Operations, had not responded to Plaintiff's request to purchase a water purifier. (*Id.* at 3.) Bowers also informed Plaintiff

that his complaint was forwarded to the Assistant Director for Facilities to address questions regarding the plumbing and water filtration at Eyman Complex. (*Id.*)

Defendant Bowers' response is insufficient to show that she was aware of toxic or contaminated water at Plaintiff's Unit. As she wrote, there was no evidence to show that the water was contaminated. As a non-medical official who worked as the appeals Administrator, Defendant Bowers would not have had access to Plaintiff's medical HNRs, so she was not on notice of Plaintiff's health issues, nor was she trained or in a position to infer that Plaintiff's health issues were caused by the Unit's drinking water.

As to Defendant Malone, the grievance documents show only that he was sent an inquiry regarding Plaintiff's request to purchase a water purifier. There is no evidence Malone received this request. But even assuming that he did, there is no evidence that the request contained sufficient information that would have put him on notice that contaminated water caused Plaintiff's serious health issues. Like Bowers, Malone was a non-medical official and did not review prisoner HNRs, so he was not on notice of Plaintiff's health issues.

In support of their Motion, State Defendants submit Plaintiff's deposition testimony, in which he was asked whether Defendants were aware of the situation with Plaintiff's stomach issues and the bad water. (Doc. 59-8 at 9–10; Pl. Dep. 80:23–25.) Plaintiff responded, "I'm not sure if they were aware or not, but I mean, they could have been aware or they couldn't have. I can't tell you. You know what I mean? Because I don't know that. I wrote them the grievance." (*Id.* at 10, 81:1–4.) Plaintiff's speculation as to whether Bowers and Malone were aware of contaminated water and Plaintiff's stomach issues is insufficient to create a material fact on the subjective prong of his conditions-of-confinement claim. *See Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004) (speculation as to a defendant's subjective knowledge does not create a factual dispute on summary judgment). Accordingly, State Defendants' Motion will be granted as to the

Eighth Amendment conditions-of-confinement claim in Count Two.[8]

Based on the foregoing,

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to State Defendants' Motion for Summary Judgment (Doc. 58) and Medical Defendants' Motion for Summary Judgment (Doc. 89).

(2)    State Defendants' Motion for Summary Judgment (Doc. 58) is **granted in part** and **denied in part** as follows:

> (a)    the Motion is **granted** as to the claims against Shinn, Bowers, and Malone in Counts One and Two;

> (b)    the Motion is **denied** as to the issue of exhaustion; and

> (c)    the Motion is **denied** as to the official policy claim against Thornell in Count One.

(3)    Medical Defendants' Motion for Summary Judgment (Doc. 89) is **denied**.

(4)    Count Two is **dismissed**.

(5)    Shinn, Bowers, and Malone are **dismissed** as Defendants.

(6)    The remaining claims are the Eighth Amendment medical care policy claims against Centurion and NaphCare in Count One, the official capacity claim against Thornell in Count One, and the Eighth Amendment medical care claim against NP Thomas in her individual capacity in Count Three.

(7)    This action is referred to Magistrate Judge Bachus to conduct a settlement conference.

/ / /

/ / /

/ / /

/ / /

---

[8] In light of this finding, the Court need not address State Defendants' argument for qualified immunity as to Bowers and Malone.  (*See* Doc. 58 at 14–15.)

- 41 -

(8)    Defense counsel shall arrange for the relevant parties to jointly call the chambers of Magistrate Judge Bachus at (602) 322-7610 within 14 days to schedule a date for the settlement conference.

Dated this 19th day of March, 2026.

James A. Teilborg
Senior United States District Judge